# EXHIBIT

# A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| ACE AMERICAN INSURANCE COMPANY, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 2:13-CV-01613 |
| | : | |
| v. | : | |
| | : | Hon. Mitchell S. Goldberg |
| MEADOWLANDS DEVELOPER LIMITED | : | |
| PARTNERSHIP, | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| Respondent. | : | |
| | : | |

---

**SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENT
MEADOWLANDS DEVELOPER LIMITED PARTNERSHIP'S
MOTION TO VACATE DEFAULT JUDGMENT**

## I.      INTRODUCTION

Petitioner ACE American Insurance Company ("ACE") submits this Supplemental Memorandum of Law in further opposition to Respondent Meadowlands Developer Limited Partnership's ("MDLP") Motion to Vacate Default Judgment to bring the Court's attention to relevant admissions made by Ronald Sanders, General Counsel of Colony Capital, during a deposition taken on January 7, 2015—*after* the pending Motion to Vacate was fully briefed—in connection with litigation pending in the State of New Jersey.  Mr. Sanders's testimony confirms certain key facts advanced by ACE in opposition to the Motion to Vacate, namely: (i) Colony Capital was the managing agent of Meadowlands LP; (ii) Mr. Sanders personally received notice related to the arbitration, including in 2013, when the Petition in this case was served on MDLP; and (iii) MDLP's failure to defend the arbitration was knowing and deliberate.  Excerpts of Mr. Sanders's deposition transcript are attached hereto as Exhibit 1 ("Sanders Dep. Tr.").

## II.     COLONY CAPITAL IS MANAGING AGENT OF MEADOWLANDS LP

Mr. Sanders's testimony unequivocally establishes that MDLP's claim that Colony Capital is "an entirely separate entity" from Meadowlands LP is disingenuous and wrong.  *See* Reply Br. at 6, Docket No. 21.  Mr. Sanders explained that Colony 7 and Colony 8, which are funds run by Colony Capital, own in part Meadowlands LP.  Sanders Dep. Tr. at 42:14-18; *see also id.* at 39-40.   Sanders also admitted that Colony Capital was the managing agent of Meadowlands LP.  According to Sanders, Meadowlands Limited Partnership does not "conduct[] business on an ordinary day to day basis."  *Id.* at 44:12-15.  Instead, all of Meadowlands LP's business was conducted by Colony Capital:

> Q:     Do you know who, if anyone, handles whatever business affairs Meadowlands Limited Partnership does have on a day-to day-basis?
>
> THE WITNESS:     Whatever management needs there are would primarily be conducted by Colony Capital in its role as manager for Colony Capital Investors 7 and Colony Capital Investors 8.

*Id.* at 44:16-25 (objections omitted).

## III.    SANDERS RECEIVED ARBITRATION DOCUMENTS SERVED ON MDLP THROUGH COLONY CAPITAL

Sanders also admitted that, through the normal procedures that Colony Capital has established to handle legal mail, he received copies of ACE arbitration documents served on MDLP through Colony Capital:

> Q:     Other than the subpoena, are you aware of any legal documents related to MDLP being received by any office of Colony Capital?
>
> THE WITNESS: We have a system set up through our registered agent for service of process where, when they receive service of process through the computer system, that is forwarded to people within our offices and I believe that *in connection with ACE's arbitration claim against MDLP, that there would have been*

2

> ***notices and other materials that, through this system, I would
> have seen.***

*Id.* at 59:10-60:3 (objections omitted) (emphasis added).   Sanders admitted that he received

notices relating to the arbitration from as early as 2010 through August 2013, either directly, or

through other staff at Colony Capital who would have forwarded such notices to him as a matter

of policy.  *Id.* at 61:9-14; 60:10-13, 73:8-16.  Sanders specifically admitted that in 2013, when

the Petition was filed, "I do remember getting notices relating to the arbitration."  *Id.* at 63:18-

23; *see also* 144:7-12.

## IV.    SANDERS ADMITTED THAT HE INTENTIONALLY DISREGARDED NOTICE OF THE ARBITRATION

Sanders's testimony confirms that MDLP's decision to disregard the arbitration was

knowing and deliberate.   When asked what he did with the notices that he directly received

regarding the arbitration, Sanders admitted that "I don't believe I really did anything with them."

*Id.* at 64:2-3.    In fact, when asked "who made the decision not to defend the arbitration,"

Sanders admitted that "[t]hat was my decision . . . I made that decision not to defend."  *Id.*

148:10-12, 149:23-24.

Respectfully submitted,

**DUANE MORRIS LLP**


/s/ Sean S. Zabaneh
Sean S. Zabaneh (No. 201085)
Andrew R. Sperl (No. 311467)
30 S. 17th Street
Philadelphia, PA  19103
Phone: (215) 979-1149
Fax: (215) 689-4964
sszabaneh@duanemorris.com
arsperl@duanemorris.com

*Counsel for Petitioner*
*ACE American Insurance Company*

3

# EXHIBIT
# 1

```
 1                          oOo

 2  SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
 3  -------------------------------------------
 4  IN THE MATTER OF THE APPLICATION OF:

 5  MARKS, O'NEILL, O'BRIEN, DOHERTY &
    KELLY, P.C.,
 6
                   Petitioner,
 7
     - against -                          INDEX NO:
 8                                         157430/2014

 9  For an Order taking the deposition
    of Ronald Sanders,
10
                   Respondent,
11
    And for the production of documents by
12  Ronald Sanders for the use in an action
    pending in the State of New Jersey
13  entitled, ACE AMERICAN INSURANCE COMPANY v.
    MEADOWLANDS DEVELOPER LIMITED PARTNERSHIP.
14  -------------------------------------------
                           -   -   -
15            Wednesday, January 7, 2015
                    10:00 a.m.
16                         -   -   -
      Oral deposition of RONALD SANDERS, taken pursuant
17  to notice, was held at the law offices of DICKSTEIN
    SHAPIRO, located at 1633 Broadway, New York, New
18  York, on the above date and time, before Mercedes
    Marney, RPR, a Court Reporter and Notary Public in
19  the state of New York.

20

21

22
              ROSENBERG & ASSOCIATES, INC.
23        Certified Court Reporters & Videographers
     425 Eagle Rock Ave., Ste 201   250 Park Ave., 7th Fl.
24  Roseland, NJ 07068               New York, NY 10177
      (973) 228-9100    1-800-662-6878    (212) 868-1936
25            www.rosenbergandassociates.com
```

2

```
 1                          o0o

 2             A P P E A R A N C E S:

 3

   FOR THE PETITIONER:
 4
        DUANE MORRIS
 5
   BY: ERIC R. BRESLIN, ESQUIRE
 6      MELISSA S. GELLER, ESQUIRE
        One Riverfront Plaza
 7      1037 Raymond Boulevard
        Suite 1800
 8      Newark, New Jersey 07102
        973.424.2016
 9      msgeller@duanemorris.com
        erbreslin@duanemorris.com
10

11 FOR THE RESPONDENT:
        PILLSBURY, WINTHROP, SHAW, PITTMAN LLP
12 BY: ANDREW C. SMITH, ESQUIRE
        MATTHEW D. STOCKWELL, ESQUIRE
13
        1540 Broadway
14      New York, New York 10036
        212.858.1000
15      andrew.smith@pillsburylaw.com
        matthew.stockwell@pillsburylaw.com
16

17

18

19

20

21

22

23

24

25
```

```
 1                          o0o
 2  A P P E A R A N C E S (Continued)
 3
 4  FOR THE RESPONDENT:
 5
 6        DICKSTEIN SHAPIRO LLP
 7
 8  BY: JEFFREY A. MITCHELL, ESQUIRE
 9        1633 Broadway
10        New York, New York 10019
11        212.277.6691
12        mitchellj@dicksteinshapiro.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    Direct - R. Sanders
 2        Q    Let me try to get to it another way.
 3             MR. MITCHELL:  You didn't let him
 4         finish his sentence.
 5             MR. BRESLIN:  That is true.  I
 6         apologize.
 7             THE WITNESS:  I was done anyway.
 8             MR. BRESLIN:  But I do apologize.
 9   BY MR. BRESLIN:
10        Q    Are there other tier companies, other
11   than those reflected on MDLP524, between Colony 7
12   and 8 and Meadowlands Limited Partnership?
13        A    I don't believe so.
14        Q    So this list of entities -- and by
15   "this list" I'm referring to the entities set
16   forth on 524 -- are they a complete list of the
17   entities that existed between Colony 7 and 8 and
18   Meadowlands Limited Partnership?
19        A    I believe so.
20        Q    When was Meadowlands Limited
21   Partnership created?
22        A    I don't know that.
23        Q    Who created Meadowlands Limited
24   Partnership?
25        A    I believe it was Mills Corporation,
```

```
 1                    Direct - R. Sanders
 2  but I'm not sure about that.
 3       Q    Was Meadowlands Limited Partnership
 4  an entity that Colony set up or did it acquire it
 5  from another party?
 6       A    Can I hear that back again, please?
 7            MR. BRESLIN:  I will rephrase it.
 8  BY MR. BRESLIN:
 9       Q    Did Colony or any of its affiliates
10  create Meadowlands Limited Partnership?
11       A    I don't believe so.
12       Q    Did Colony or any of its affiliates
13  acquire the entity, Meadowlands Limited
14  Partnership?
15            MR. MITCHELL:  Object to the form of
16        the question.
17  BY MR. BRESLIN:
18       Q    Answer it, if you can.
19       A    I don't think "acquire" is the right
20  term.  It made -- those entities made an
21  investment into Meadowlands Limited Partnership.
22       Q    Am I correct, then, that Meadowlands
23  Limited Partnership existed before Colony 7 and 8
24  made the investment?
25            MR. MITCHELL:  Object to the form of
```

```
 1                     Direct - R. Sanders
 2          the question.
 3                  THE WITNESS:  I believe so.
 4   BY MR. BRESLIN:
 5        Q      And Colony 7 and 8 invested the money
 6   into Meadowlands Limited Partnership?
 7                  MR. MITCHELL:  Object to the form of
 8          the question.
 9   BY MR. BRESLIN:
10        Q      Answer it, if you can.
11                  MR. MITCHELL:  I assume you're not
12          doing it intentionally.  You mean through
13          these various vehicles, because you leave
14          that out.
15                  MR. BRESLIN:  Correct.  I mean
16          through the various vehicles.
17                  MR. MITCHELL:  Okay.  The question
18          was not direct investment.  The question
19          was, through the various vehicles, did 7
20          and 8 make the investment into Meadowlands
21          Limited Partnerships?
22                  MR. BRESLIN:  Yes.
23                  THE WITNESS:  Yes.
24   BY MR. BRESLIN:
25        Q      And Meadowlands Limited Partnership
```

```
 1                    Direct - R. Sanders
 2    was an extant existing entity, at the time this
 3    investment was made through the other vehicles?
 4          A     I believe so.
 5          Q     Did you ever hold any position with
 6    Meadowlands Limited Partnership?
 7          A     I don't know.
 8          Q     Is Meadowlands Limited Partnership
 9    still in existence?
10          A     Yes.
11          Q     Does it do business today?
12          A     No.
13          Q     When was the last time, to your
14    knowledge, that Meadowlands Limited Partnership
15    did business?
16          A     I wouldn't think that I would view
17    Meadowlands Limited Partnership really as ever
18    conducting a business.  It had an interest in the
19    Xanadu project, but I don't -- it was not an
20    active operating company.
21          Q     Other than the interest in the Xanadu
22    project, are you aware of any other projects or
23    investments or activities, and this is a compound
24    question, that Meadowlands Limited Partnership
25    engaged in?
```

```
 1                  Direct - R. Sanders
 2              MR. MITCHELL:  Objection to form.
 3              MR. BRESLIN:  I'll break it down.
 4              MR. MITCHELL:  Yes.  Okay.
 5  BY MR. BRESLIN:
 6      Q      Other than the Xanadu Investments,
 7  are you aware of any other investments that
 8  Meadowlands Limited Partnership ever undertook?
 9      A      No.
10      Q      Other than the Xanadu Investment, are
11  you aware of any other business activities
12  undertaken by Meadowlands Limited Partnership?
13      A      No.
14      Q      Do you know who owns Meadowlands
15  Limited Partnership today?
16      A      It would be, indirectly, the Colony 7
17  and Colony 8 funds, as well as, again indirectly,
18  a Dune Real Estate fund.
19      Q      Spell that for me?
20      A      Dune, D-U-N-E, Real Estate fund.  And
21  I think, indirectly, one or two Kan-Am investment
22  vehicles.  Kan, K-A-N, second word, A-M.
23      Q      What is the Dune real estate fund?
24      A      I'm not personally familiar with the
25  Dune Real Estate fund.  But I believe it's a --
```

                    Direct - R. Sanders
1    similar to the Colony Investment funds -- it's a
2    fund that was sponsored by Dune Real Estate
3    Management to make real estate investments.
4         Q     Is it a Colony Capital related entity
5    or is it a different entity?
6         A     It is not related to Colony Capital.
7         Q     And the two Kan-Am funds that you
8    mentioned, are they related to Colony Capital?
9         A     No.
10        Q     Did Meadowlands Limited Partnership
11   ever have a physical office that you were aware
12   of?
13        A     I would assume that any legal entity
14   has to have a principal office, but I don't know
15   what Meadowlands Limited Partnership's office
16   would be.
17        Q     Did you ever know where it was?
18        A     No.
19        Q     Do you know if Meadowlands Limited
20   Partnership ever had employees?
21        A     I don't believe so.
22        Q     Do you know if Meadowlands Limited
23   Partnership ever had any assets other than the
24   investment in the Xanadu that we've discussed

```
 1                    Direct - R. Sanders
 2  previously?
 3       A     I don't believe so.
 4       Q     Who runs the day-to-day affairs of
 5  Meadowlands Limited Partnership as of today, if
 6  you know?
 7              MR. MITCHELL:  Object to the form of
 8         the question.  Lack of foundation.
 9              MR. BRESLIN:  I'll rephrase it if you
10         want.
11  BY MR. BRESLIN:
12       Q     Do you know if Meadowlands Limited
13  Partnership conducts business on an ordinary
14  day-by-day basis?
15       A     I don't believe it does.
16       Q     Do you know who, if anyone, handles
17  whatever business affairs Meadowlands Limited
18  Partnership does have on a day-to-day basis?
19              MR. MITCHELL:  Objection to form.
20              You can answer.
21              THE WITNESS:  Whatever management
22         needs there are would primarily be
23         conducted by Colony Capital in its role as
24         manager for Colony Capital Investors 7 and
25         Colony Capital Investors 8.
```

```
 1                  Direct - R. Sanders
 2  BY MR. BRESLIN:
 3        Q      And would the office of Meadowlands
 4  Limited Partnership, to the extent it has an
 5  office, be one of the Colony Capital offices?
 6        A      That, I don't know.
 7        Q      Do you know if you ever had a
 8  position at Meadowlands Limited Partnership?
 9        A      I don't know that.
10        Q      Are you familiar with an entity known
11  as Meadowlands Developer Limited Partnership?
12        A      Yes.
13        Q      Tell me what your understanding of
14  Meadowlands Developer Limited Partnership is.
15        A      It is a subsidiary of Meadowlands
16  Limited Partnership.
17        Q      When was it created?
18        A      I believe it was in existence at the
19  time that Colony Investors 7 and Colony Investors
20  8 made their investments, and no, I don't know
21  when it would have been created.
22             MR. MITCHELL:  Were you talking about
23         at the time of this document?  Because at
24         the time frame of the answer I want to
25         make sure we're talking at the same time
```

```
1                 Direct - R. Sanders
2  legal process served on Colony Capital?
3        A     Yes.
4        Q     Did you ever receive, at any time,
5  legal process served upon MDLP?
6        A     Could you clarify a little for me,
7  please?  When you say, have I received legal
8  process served upon MDLP, are you saying in my
9  capacity -- in what capacity?
10       Q     Your capacity as general counsel.
11       A     Of Colony Capital?
12       Q     Correct.
13       A     No, I don't believe in my capacity I
14 ever would have received.
15       Q     Did you ever receive any legal
16 process served on MDLP, personally?
17             MR. MITCHELL:  Object to the form of
18        the question.
19             THE WITNESS:  No.
20 BY MR. BRESLIN:
21       Q     Are you aware of any legal process on
22 MDLP ever being received in any office of Colony
23 Capital?
24       A     Would the subpoena that came to me
25 count?
```

```
 1                    Direct - R. Sanders
 2        Q      In addition to that.
 3              MR. MITCHELL:  Could I hear the
 4        question before the answer, please?
 5              (The Record was read back.)
 6              MR. MITCHELL:  Object to the form of
 7        the question to the extent it
 8        characterizes the subpoena.
 9  BY MR. BRESLIN:
10        Q      Other than the subpoena, are you
11  aware of any legal documents related to MDLP
12  being received by any office of Colony Capital?
13              MR. MITCHELL:  Object to the form of
14        the question.
15              You can answer.
16              THE WITNESS:  I'm going to give a
17        little bit of an explanation answer.
18              We have a system set up through our
19        registered agent for service of process
20        where, when they receive service of
21        process through the computer system, that
22        is forwarded to people within our offices
23        and I believe that in connection with
24        ACE's arbitration claim against MDLP, that
25        there would have been notices and other
```

```
 1                    Direct - R. Sanders
 2          materials that, through this system, I
 3          would have seen.
 4  BY MR. BRESLIN:
 5       Q     Okay.  Who receives those notices --
 6  or who received the notices related to ACE's
 7  arbitration demand?
 8              MR. MITCHELL:  Object to the form of
 9          the question.
10              THE WITNESS:  Through this system --
11          I'll get into a little bit of detail -- my
12          assistant.  So I think I also get the
13          e-mail notice from CSC.
14  BY MR. BRESLIN:
15       Q     CSC is your registered agent?
16       A     That's the registered agent for MDLP,
17  or was, I don't know if it still is or not but it
18  was at the time.
19              And my assistant gets those also.
20  She reviews them.  And she forwards them as
21  appropriate.  So I believe that, with respect to,
22  as I said, the ACE arbitration matters, that she
23  would have forwarded those to me to review.
24       Q     What's the name of your assistant?
25       A     Her name -- now with -- my current
```

```
 1                  Direct - R. Sanders
 2  assistant is Maggie.  I'm going to try to spell
 3  it.  I think this is the correct spelling,
 4  W-D-I-O-W-A-K, I believe.
 5       Q     Let's try to make this easier.  What
 6  period of time are we discussing here with
 7  reference to the notification from CSC as of the
 8  ACE claim?
 9       A     I don't know the specific dates, but
10  I believe that those would have been -- could
11  have started 2010, 2011.  I'm not exactly sure
12  about that.  And I believe that I was still
13  getting notice -- some notices through August of
14  2013.
15       Q     And was Maggie your assistant in
16  2010, 2011 through 2013?
17       A     No.
18       Q     What was the name of your assistant
19  in 2010, 2011, through 2013?
20       A     That would be Rabih, R-A-B-I-H
21  Colter, C-O-L-T-E-R.
22             But to make things a little more
23  complicated, that there used to be a paralegal in
24  our California office who used to receive these
25  and forward them as appropriate.
```

```
 1                    Direct - R. Sanders
 2        Q      And CSC, do you understand that to
 3   stand for Corporation Services Company?
 4        A      Yes.
 5        Q      And so how many people receive
 6   notices -- how many people at or related to
 7   Colony receive notice from CSC related to the ACE
 8   claim against MDLP, to the best of your
 9   recollection?
10              MR. MITCHELL:  Objection to form.
11              MR. SMITH:  Objection to form.
12   BY MR. BRESLIN:
13        Q      Go ahead.
14        A      Currently, our system is set up so
15   that the notices go to myself, to Maggie, and, I
16   believe, to my assistant GC, David Palame.
17        Q      What was the system in 2010 or 2011,
18   who got them then?
19        A      I believe it was our legal assistant
20   in California, whose name is Joy Mallory,
21   M-A-L-L-O-R-Y.
22        Q      And she sits in the Colony Santa
23   Monica office?
24        A      She did.
25        Q      Who else got them in 2010 and 2011?
```

```
1                    Direct - R. Sanders
2         A     I don't remember if I was getting
3    them at that time or not.
4         Q     Was your assistant getting them at
5    that time?
6         A     I don't believe so.
7         Q     Ms. Mallory was getting them at that
8    time?
9         A     I believe so, yes.
10        Q     When did you start to get them?  Did
11   you start to get them in 2011 and 2012?
12        A     I believe I started to get them when
13   Joy Mallory left the company.
14        Q     Which was when?
15        A     I don't know the specific date.
16        Q     Do you know the year?
17        A     Not specifically, no.
18        Q     Do you have a recollection as to
19   whether you were getting notices from CSC related
20   to ACE's claim against MDLP in the year 2013?
21        A     Through the electronic notification
22   system, I do remember getting notices relating to
23   the arbitration.
24        Q     What did you do with those notices,
25   if anything?
```

                        Direct - R. Sanders

1

2        A      I don't believe I really did anything

3   with them.

4        Q      Did you send them to anyone?

5        A      I don't believe so.

6        Q      Did you forward them to anyone within

7   the company?

8                MR. MITCHELL:  Object to the form of

9           the question.  That's different --

10               MR. BRESLIN:  It's because it's an

11          e-mail is because it's slightly different.

12  BY MR. BRESLIN:

13       Q      Did you forward the e-mails to

14  anyone?

15       A      I don't believe so.

16       Q      Did you have a folder on your

17  computer where you put these e-mails?

18       A      Yes.

19       Q      Is that folder still in existence?

20       A      It should be.

21       Q      So on your work computer, there is a

22  folder containing the notices that you got from

23  CSC pertaining to ACE's claim against MDLP?

24               MR. SMITH:  Objection to form.

25

                    Direct - R. Sanders

1                   Direct - R. Sanders
2  BY MR. BRESLIN:
3       Q     Is that correct?
4       A     There is a folder.  I don't want to
5  say that every single notice I got was put in the
6  folder, but there's a folder that I believe has
7  notices relating to the ACE arbitration.
8       Q     Did you forward that folder or any of
9  its contents at any time to anyone at Ameream?
10      A     I don't think so.
11      Q     Did you forward that folder or any of
12 its contents at any time to anyone related to any
13 Triple 5 entity?
14            MR. SMITH:  Objection to form.
15            THE WITNESS:  Not that I remember.
16 BY MR. BRESLIN:
17      Q     Did you forward that folder or any of
18 its content to Mr. Calascibetta?
19      A     Not that I remember.
20      Q     How many times do you recall
21 receiving notices regarding the ACE claim against
22 MDLP?
23      A     I wouldn't have a specific number.
24      Q     More than five?
25      A     Could be.  There is -- there were a

```
 1                    Direct - R. Sanders
 2  various offices of Colony Capital by process
 3  servers defined generically?
 4        A     Yes.
 5        Q     In general, are those -- do those
 6  documents find their way to you as the company's
 7  general counsel?
 8        A     Generally, yes.
 9        Q     From time to time, are legal
10  documents received by Colony Capital through the
11  offices of the United States mail or Federal
12  Express or DHL?
13        A     When you say legal documents, we're
14  still talking about --
15              MR. MITCHELL:  That's where we get --
16          can we be specific in terms of legal
17          documents?  What do you mean by legal
18          documents?
19              MR. BRESLIN:  Documents related to
20          litigation.
21              THE WITNESS:  Yes.
22  BY MR. BRESLIN:
23        Q     And they are received from time to
24  time from the company in the mail or by Federal
25  Express or by some other method of moving
```

```
 1                    Direct - R. Sanders
 2  documents around, correct?
 3       A     Correct.
 4       Q     And in the general course of things,
 5  do those documents find their way to you as the
 6  company's general counsel?
 7       A     Generally, yes.
 8       Q     And there is -- is there a written
 9  protocol at the company that legal documents
10  related to litigations be sent to Mr. Sanders?
11       A     I don't know if there's a written
12  policy to that effect.
13       Q     Is there a de facto practice at the
14  company of sending documents related to
15  litigations to Mr. Sanders?
16       A     Yes.
17       Q     And are secretaries and mail room
18  people and other staff at Colony Capital, to your
19  knowledge, instructed that when legal documents
20  related to litigations come into the various
21  offices, that they be sent to Mr. Sanders?
22       A     I think that's a little bit too
23  broad, "people in the mail room."
24             I believe that if those documents do
25  come in, they'll end up in the hands of either
```

                    Direct - R. Sanders

1

2  people in New York who would know or if it's in

3  California, they would end up in the hands of

4  some of the legal assistants in California who

5  would know what to do with it.

6           But I don't think that there's

7  necessarily a company-wide protocol among

8  assistants and mail room persons and the like,

9  that says, if a document related to litigation

10  comes in, send it to Ron Sanders.

11     Q    Will you say that the legal

12  assistants who would get these documents, would

13  know what to do with it, correct?  You just

14  mentioned that on your prior answer.

15     A    Yes.

16     Q    And the knowing what to do with it,

17  quote/unquote, would be to send it to you,

18  correct?

19     A    Correct.  Or at a minimum, make me

20  aware of it.

21     Q    Thank you.

22           Let's mark this as Sanders 2.

23           (Sanders Exhibit Number 2 was marked

24        for identification, as of this date.)

25

1                    Direct - R. Sanders

2        A     He is either a vice president or a

3   senior vice president.

4        Q     Did he have any involvement with the

5   Colony 7, Colony 8 investment?

6        A     He did also provide services on

7   behalf of this particular investment.

8        Q     Do you know if he had any dealings

9   with ACE regarding the ACE claim?

10        A     I believe that Varun also was on some

11   of the calls that I had with Mr. Toren and

12   others.

13        Q     Do you know if Varun had any

14   communications with anyone from ACE in which you

15   were not a party?

16                 MR. MITCHELL:  Object to the form of

17         the question.

18                 THE WITNESS:  I don't know for sure,

19         but I doubt it.

20   BY MR. BRESLIN:

21        Q     When did you first become aware that

22   ACE had instituted a claim for arbitration for

23   the unpaid premiums?

24        A     I wouldn't know the specific date or

25   even the general timeline.  It was some -- might

```
 1               Direct - R. Sanders
 2  have been 2010, 2011, but I'm not sure about
 3  that.
 4       Q     You don't know -- you don't even have
 5  a year in which you can give me as to when you
 6  found out for the first time?
 7       A     I do not.  As I mentioned earlier,
 8  through the CSC electronic system, I would get
 9  notices of the institution of the arbitration and
10  then I would get notices that the arbitration was
11  being adjourned and rescheduled, and that
12  happened a number of times.
13             So my recollection is from the first
14  notice until the arbitration hearing actually
15  took place, there was quite a long time between
16  those two.
17       Q     And these were notices that you
18  placed in a folder on your desktop computer?
19             MR. MITCHELL:  Object to the form of
20          the question.
21  BY MR. BRESLIN:
22       Q     Are these notices that you placed in
23  a folder on your desktop computer?
24       A     I believe I did.  I may not have
25  gotten every one, but I -- generally, I believe I
```

```
 1                 Direct - R. Sanders
 2   did.
 3        Q     And that folder is still on your
 4   desktop computer, as we sit here today?
 5        A     Yes.
 6             MR. MITCHELL:  Can I hear that
 7        question again?
 8             (The Record was read back.)
 9             MR. MITCHELL:  Objection to form.
10   BY MR. BRESLIN:
11        Q     Is it still on your desktop computer,
12   as far as you know?
13        A     Yes.
14             MR. BRESLIN:  I would make a request
15        that nothing happen to it, obviously.
16   BY MR. BRESLIN:
17        Q     I may have asked you this before.  If
18   I did, I apologize.  In advance.
19             Do you recall when was the first time
20   you discussed this arbitration with a
21   representative of Triple 5, or anyone affiliated
22   with the purchaser?
23        A     I don't recall specifically but my
24   guess is it would have been sometime during 2012.
25        Q     Who did you discuss it with?
```

```
 1              Direct - R. Sanders
 2        A     I believe it would have been with Joe
 3  Calascibetta and -- what was the, if you can
 4  remember, the content of that conversation?
 5        A     It was --
 6              MR. SMITH:  Sorry, when?  What was
 7        the time frame?
 8              MR. MITCHELL:  Sometime in 2012.  I
 9        have a recollection we did this already.
10              MR. BRESLIN:  Possibly.
11              MR. MITCHELL:  Why are we doing it
12        again?
13              MR. BRESLIN:  Because I want to.
14              MR. MITCHELL:  You don't do things
15        twice.  We did this, we went through all
16        the conversations.
17              MR. BRESLIN:  This is a different
18        area.  Are you instructing him not to
19        answer?
20              MR. MITCHELL:  I'll let it go for a
21        couple of questions, but I'm not going to
22        have -- we're not repeating testimony.
23        See if it's different.  If it turns out to
24        be the same, then we'll stop there.
25              THE WITNESS:  It would have been in
```

```
 1                    Direct - R. Sanders
 2          the context of -- as part of the
 3          negotiation of the purchase agreement in
 4          the context of alerting him that this
 5          claim was there.
 6               And our agreement that the claim
 7          stays with MDLP and that would not be
 8          MDLP's responsibility after the closing.
 9   BY MR. BRESLIN:
10          Q     Are you aware whether MDLP defended
11   the claim for arbitration that was made by ACE?
12          A     I do not believe MDLP did defend that
13   arbitration.
14          Q     Why?
15               MR. MITCHELL:  You can answer the
16          question without revealing any privileged
17          communication.  Do so if you can only do
18          it by not revealing privilege.  And state
19          that -- or I will direct you not to
20          answer.
21               Can you talk about this?
22               THE WITNESS:  Yeah, I mean I wouldn't
23          mind.
24               (Off the record.)
25               MR. MITCHELL:  I've consulted with my
```

```
 1                    Direct - R. Sanders
 2           client off the record.  You have the
 3           answer that a decision was made, that the
 4           arbitration would not be defended.  The
 5           reasons why are privileged and we're
 6           asserting attorney/client privilege with
 7           respect to any determination made as to
 8           why that was the decision.
 9   BY MR. BRESLIN:
10        Q    Can you tell me who made the decision
11   not to defend the arbitration?  Not what was
12   said, simply who made the decision?
13                MR. MITCHELL:  He's unable to
14           answer --
15                MR. BRESLIN:  No, no, no.  Either
16           object, but don't answer the question.
17                MR. MITCHELL:  I'm not.  I'm
18           directing the witness not to answer on the
19           grounds of attorney-client privilege.
20                MR. BRESLIN:  A who question is not
21           subject to the attorney/client privilege.
22           It's not calling for the content of any
23           legal advice that he gave to anyone or any
24           information that he got from his client.
25           I'm simply asking for the name of the
```

```
 1                    Direct - R. Sanders
 2          person who made the decision.  That cannot
 3          be privileged.
 4                MR. MITCHELL:  I'm directing the
 5          witness not to answer on the grounds of
 6          privilege.
 7  BY MR. BRESLIN:
 8          Q     Was that --
 9                MR. MITCHELL:  Can I just -- sorry.
10                (Off the record.)
11                MR. MITCHELL:  Back on the record.
12                Mr. Sanders will identify the person
13          who made the determination.
14                MR. BRESLIN:  Thank you, Counsel, I
15          appreciate that.
16                THE WITNESS:  That was my decision.
17  BY MR. BRESLIN:
18          Q     Thank you, Mr. Sanders, I appreciate
19  it.
20                Who made the decision not to defend
21  the ACE arbitration?
22                MR. MITCHELL:  He just --
23                THE WITNESS:  I made that decision
24          not to defend.
25
```

```
 1                  Direct - R. Sanders
 2  BY MR. BRESLIN:
 3       Q    I'm sorry, I thought you said the
 4  decision to answer the question was yours.  I
 5  apologize.
 6       A    No.
 7       Q    Did you consult anyone at the State
 8  of New Jersey before you made that decision?
 9       A    That sounds like that's getting into
10  some privileged stuff now.
11       Q    That would be conversations with a
12  third party from the State of New Jersey.
13            MR. MITCHELL:  You can answer that.
14            THE WITNESS:  Okay.  No, I did not.
15  BY MR. BRESLIN:
16       Q    Did you consult anyone at any Triple
17  5 entity, including Ameream, before you made that
18  decision?
19            MR. MITCHELL:  You can answer that.
20            THE WITNESS:  No, I did not.
21  BY MR. BRESLIN:
22       Q    Did you inform anyone at any of the
23  Triple 5 entities, including Ameream, after you
24  made that decision?
25       A    I don't recall a specific
```